8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CHARLES JOHNSON,

11          Plaintiff,                    No. CIV S-06-1676 GEB EFB P

12      vs.

13   S. M. ROCHE, et al.,
                                          ORDER AND FINDINGS
14          Defendants.                   AND RECOMMENDATIONS

15   _____/

16          Plaintiff is a state prisoner proceeding without counsel in an action brought under 42

17   U.S.C. § 1983.  Currently under consideration is defendants' motion for summary judgment.  For

18   the reasons explained below, the motion for summary judgment must be granted.

19   **I.      Plaintiff's Allegations**

20          Plaintiff claims in his July 31, 2006, complaint that Doctors Roche and James were

21   deliberately indifferent to his serious medical needs, i.e., a tracheotomy.  In particular, plaintiff

22   claims that on November 7, 2005, he saw Dr. James for his tracheotomy, complained that his

23   medical supplies were inadequate to care for it, and requested that the hardware for it be

24   replaced.  Compl., Attach., at 3.  He also complained of difficulty breathing, nose bleeds and a

25   sore throat because of the altitude at High Desert State Prison ("HDSP").  *Id.* at 5.  Plaintiff

26   alleges that Dr. James refused to acknowledge or treat plaintiff's complaints, and instead falsely

1

noted in the medical file that plaintiff was doing well.  *Id.* at 3, 4.  Plaintiff alleges that Dr. Roche knew of plaintiff's needs, but failed to enforce approval for plaintiff to use a suction device as needed and refused to order that plaintiff's tracheotomy hardware be replaced and that he receive equipment to care for it.  *Id.* at 5.  Plaintiff alleges that as a result, he suffered headaches and an irritating rash around his neck.  *Id.*

Plaintiff seeks damages and injunctive relief in the form of an examination by a specialist who is not associated with the California Department of Corrections and Rehabilitations ("CDCR"), transfer to a prison at a lower atmosphere, items necessary to care for his tracheotomy and keep it clean, and treatment for his sore throat and nose bleeds.  Compl., Attach., at 6-7.

**II.    Facts**

Plaintiff is a prisoner who at all times relevant to this action was housed at HDSP in Susanville, California.  At the time of the events giving rise to this action, Dr. Roche was the Chief Medical Officer ("CMO") at HDSP, whose duties were to manage the medical staff and facilitate the transfer of prisoners to outside medical facilities when necessary.  Defs.' Mot. for Summ. J., Attach. 3, Roche Decl., at ¶ 2.  He is a primary care physician, and as such is not qualified to provide specialized treatment, such as "surgical revision of an existing tracheotomy."[1]  *Id.*   That is the purview of an Otolaryngologist, i.e., an ear, nose and throat ("ENT") specialist.  *Id.* ¶ 3.  Dr. James was a primary care physician.  Defs.' Mot. for Summ. J., Attach. 4, James Decl., at ¶ 2.  His responsibility was to evaluate patients' medical needs, treat conditions when he qualified to do so, and refer patients to specialists for care of conditions beyond the scope of his competence.  *Id.*  He was not qualified to perform any surgical procedures associated with plaintiff's medical condition, i.e., an existing tracheotomy.  *Id.*, at ¶ 3.

---

[1]  Defendant Roche does not explain what this means.

1  Plaintiff's medical condition at issue here dates back to a crushed trachea injury from an

2  automobile accident in 1977. Compl. at 3; Pl.'s Nov. 21, 2007 Decl. of Svc. of Exhibits ("Pl.'s

3  Decl.") at 39. As a result, he underwent a tracheostomy, which is the surgical creation of

4  tracheotomy, i.e., an opening into the trachea through the neck.[2] Compl. at 3; Pl.'s Decl. at 39;

5  Roche Decl., at ¶ 4a; James Decl., at ¶ 4. A tracheostomy may be performed in an emergency

6  temporarily to enable a person to breathe when the airway is blocked. Roche Decl., at ¶ 4; James

7  Decl., at 4. It also can be elective surgery in order to remedy difficulty breathing caused by

8  physical abnormalities resulting from trauma or disease. Roche Decl. ¶ 4; James Decl. ¶ 4. In

9  the latter situation, i.e., a "long term" tracheotomy, a curved tube known as a cannula is inserted

10 into the windpipe to hold the neck open and enable the patient to breathe. Roche Decl. ¶ 4;

11 James Decl. ¶ 4 Good hygiene is important for maintaining a long term tracheotomy. Roche

12 Decl. ¶ 4; James Decl. ¶ 4 Ordinarily, the patient is instructed in how to keep the tracheotomy

13 clean and he or she does it him or herself. Roche Decl. ¶ 4; James Decl. ¶ 4. At times, it may be

14 necessary to use suction to remove mucus or other secretions. Roche Decl. ¶ 4; James Decl. ¶ 4.

15 However, this again is something many patients do themselves. Roche Decl. ¶ 4a; James Decl. ¶

16 4. In fact, on October 28, 2005, Dr. Cox, who is not a defendant in this action, ordered plaintiff

17 "[one] trach kit - one for one exchange Q daily; 6 pre cut 4x4 Q week; 5 cotton tipped

18 applicators Q week; [hydrogen peroxide] & sterile [water] in a 50/50 concentration 90 cc Q

19 week one for one exchange; [one] roll tape Q 2 weeks." Pl.'s Decl. at 64.

20      The court now turns to the facts concerning defendants' involvement in the events giving

21 rise to this action. Dr. James examined and treated plaintiff several times.[3] James Decl. ¶ 5. He

22

23      [2] Plaintiff refers to the opening in his neck as a "tracheostomy." Defendant Roche
explains that the terms "tracheostomy" and "tracheotomy" may be used interchangeably. Roche
24 Decl., ¶ 4(a). For the sake of clarity, the court refers to the creation of the opening as a
tracheostomy and the opening itself as a tracheotomy.
25

26      [3] Prisoners are not assigned a primary care physician. James Decl., ¶4(a). Instead, they
see whatever doctor is available when they visit the medical clinic. *Id.*

denies any recollection of the specific dates he examined plaintiff, but he believes that he saw plaintiff about five times. James Decl. ¶ 5(b). He asserts that at those times, he discussed with plaintiff the condition and maintenance of plaintiff's tracheotomy. *Id*. Sometimes he examined plaintiff for swelling, redness, and soreness, listened to his breathing and tested his oxygen saturation. *Id*. Each time, he concluded that plaintiff's demands with respect to the tracheotomy were not medically necessary. *Id*. The record includes an October 25, 2005, record of defendant James prescribing a "trach kit," including a bristle brush, four pipe cleaners, two plastic q-tips, six pre-cut 4x4's, five cotton tipped applicators, hydrogen peroxide and sterile water in a 50/50 concentration, 90 cc per week as a one for one exchange on the container, and one roll of tape every two weeks. Pl.'s Decl. at 66.

On November 14, 2005, plaintiff submitted a request for reasonable accommodation under the Americans with Disabilities Act ("ADA"). Roche Decl., Exh. A at unnumbered p. 20; James Decl., Exh. A at unnumbered p. 20. In it, he claimed that when he saw Dr. James on November 7, 2005, he told Dr. James that he needed a "new tracheotomy"[4] and that every two weeks it needed to be replaced and the stoma[5] cleaned. *Id.* He complained about Dr. James' refusal to grant these requests. As an accommodation, plaintiff requested that his tracheotomy be cleaned by medical personnel every two weeks and that adequate medical supplies be issued for him to use in his cell. *Id.* He also requested that he be given permission to be housed alone for medical reasons, i.e., the tracheotomy. *Id.*

Dr. James interviewed plaintiff on December 5, 2005, about the request for reasonable accommodation. James Decl. ¶5(b). Following an examination and discussion with plaintiff, Dr. James determined that the tracheotomy functioned well and that plaintiff's lungs were clear

---

[4] It is not clear what plaintiff means by "new tracheotomy."

[5] It is not clear from the record what the "stoma" is, but it is defined as "any minute pore, orifice, or opening on a free surface." *Dorsland's Illustrated Medical Dictionary*, 27th ed., at 1585.

1    and his oxygen saturation level was normal.  James Decl. ¶ 5(a)(ii).  He also determined that

2    plaintiff was able to clean the tracheotomy himself.  He instructed plaintiff in cleaning

3    techniques, ordered cleaning supplies and confirmed that others issued those supplies to plaintiff.

4    James Decl. ¶ 5(a)(iii).  He refused to order a suction device for plaintiff to have in his cell

5    because one was available in the Correctional Treatment Center ("CTC"), and he could use it

6    whenever medical staff thought it necessary.  James Decl. ¶ 5(a)(iv).  He also refused to issue an

7    extra pillow or recommend single cell status because he did not believe that either was

8    necessary.  *Id*.  Dr. James referred plaintiff to an ENT specialist for further evaluation.  James

9    Decl. ¶ 5(a)(v).

10          Pursuant to Dr. James' referral, plaintiff saw an ENT specialist, Dr. Hudson, outside the

11   prison on December 19, 2005.  Defs.' Req. for Jud. Ntc., Exh. 4.  Dr. Hudson examined plaintiff

12   with respect to his complaints about his tracheotomy and spoke with plaintiff for a total of about

13   30 minutes.  *Id.*  She noted that plaintiff had some difficulty with drainage, but otherwise was

14   well.  *Id.*  Plaintiff reported no shortness of breath, his voice was good and he conversed well.

15   *Id.*  Plaintiff believed that in order to remain healthy, he needed to change his tracheotomy twice

16   every month.  *Id.*  Dr. Hudson determined that plaintiff needed to have the inner cannula

17   changed, but did not need the tracheotomy changed any more than once or twice every six

18   months.  Pl.'s Decl. at 55, 61.  In particular, Dr. Hudson wrote in her report that plaintiff:

19          has a Shiley #4 trach, uncuffed and in place.  Inner cannula was examined.  The
             patient was corked here in the office.  He did not have any problems of breathing
20           around it or phonating.  The stoma site itself is examined closely for any evidence
             of an infection or bleeding and none is found.

21

22   *Id*.  After discussing plaintiff's condition with him she found that:

23          [h]e was under the misguided assumption that the trach should be changed twice a
             month because otherwise it becomes infected.  He has not had any shortness of
24           breath.  He actually has a very good voice and is able to converse well.

25   *Id*.

26   ////

5

She also wrote:

> he was able to handle being corked while we were talking. He did not have any
> shortness of breath on speaking. I did ask him if he would want to consider
> having his tracheostomy tube removed. He became very indignant of this and
> actually had told me that if I would ask hm such a question, how could I even be a
> doctor. The patient, at this point seemed to be upset and I merely informed him
> that if we looked into this further, he might be able to get his tracheostomy out
> because it appears that he is speaking well and his airways are excellent.
> However, he declined to have that investigated further which is fine by me.

*Id.* She found that the inner cannula, but not the entire tracheotomy, should be changed. Defs.'
Req. for Jud. Ntc., Exh. 5. Instead, she recommended that the tracheotomy itself be changed
about once or twice every five or six months. *Id.*

Dissatisfied with Dr. Hudson's treatment, plaintiff filed an administrative appeal, which
prison officials construed to be an appeal of the denial of his request for reasonable
accommodation. Roche Decl. ¶ 5(b)(ii). In it, plaintiff stated that he had seen Dr. Hudson on
December 19, 2005, to whom he had complained of having a sore throat and difficulty in
breathing on a daily basis, and that he suffered nose bleeds because of the altitude. Roche Decl.,
Exh. A, at unnumbered pp. 18-19. He asserted that Dr. Hudson ignored his complaints. *Id.* That
grievance was denied, and in his appeal of that denial, plaintiff demanded a meeting with the
associate warden and the medical director of HDSP about his complaints. *Id.* at unnumbered p.
22. He also requested immediate transfer to a prison at a lower altitude and a review of his
medical records.[6] *Id.*

Dr. Roche, who was not directly involved in plaintiff's care, responded to the appeal on
the second formal level of review.[7] Roche Decl. ¶ 5(a). According to Dr. Roche, it is standard
practice for the CMO to rely on the findings made by medical staff in reviewing grievances on

---

[6] Plaintiff does not state why he wanted his records reviewed. Perhaps this request was
related to his belief that Dr. James made false notations in them.

[7] The CDCR grievance process has one informal and three formal levels on which prison
staff and officials review the written complaints of prisoners. *See* Cal. Code Regs. tit 15,
§ 3084.5.

1  the second formal level of review. *Id.* Thus, Dr. Roche reviewed the findings on the lower level

2  and plaintiff's medical records, and he determined that plaintiff's tracheotomy was working well,

3  his lungs were clear and his oxygen saturation level was normal. Roche Decl. ¶ 5. These latter

4  two findings suggested that plaintiff was not having difficulty breathing or that the altitude

5  adversely affected plaintiff's respiratory health or function. SUF 24. He affirmed the decision

6  below, and iterated Dr. James's findings, i.e., plaintiff must clean his tracheotomy himself, had

7  been instructed how do so, and supplies to care for the tracheotomy had been issued to him,

8  including some he had not received in the past. Roche Decl. ¶ 5(b)(iii)(bb). Dr. Roche noted

9  that plaintiff had not requested medical authority for a single cell, but in any event a single-cell

10  assignment was not medically necessary for him. *Id.* Roche denied the request for a suction

11  device, explaining that one was available for plaintiff's use in the CTC when medical staff

12  determined that such cleaning was necessary. Roche Decl. ¶ 5(b)(iii)(aa). Dr. Roche

13  determined that the single pillow issued to all prisoners was adequate for plaintiff to elevate his

14  head. Roche Decl. ¶ 5(b)(iii)(bb). Finally, based on Dr. Hudson's findings, Dr. Roche found

15  that surgical revision of the tracheotomy and professional cleaning of it were not medically

16  necessary. *Id.* Replacement tubes would be ordered at the intervals recommended by Dr.

17  Hudson. Roche Decl. ¶ 5(b)(aa).

18       In his verified opposition to summary judgment, plaintiff asserts that he intends to

19  present the declaration of Brady K. Armstrong, CDCR # K-80084 in support of plaintiff's

20  allegation that Dr. James refused to provide plaintiff proper care. Pl.'s Opp'n, at 1. Mr.

21  Armstrong will testify that he heard Dr. James tell plaintiff that he would not clean the

22  tracheotomy and that Mr. Johnson would have to clean it himself. *Id.*, Exh. 1. Plaintiff further

23  asserts that at trial he intends to present expert testimony that the "refusal to clean, treat plaintiff

24  throat [sic] area did cause the injury rash and infection complained herein plaintiff's court action

25  and or similar [sic] testimony." Pl.'s Opp'n, at 2.

26  ////

**III.    Defendants' Objections**

Defendants object to the form of plaintiff's opposition, arguing that he failed to comply with Local Rule 56-260(b). This rule requires a party opposing summary judgment to "reproduce the itemized facts in the Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any admission or other document relied upon in support of that denial." Defendants assert that plaintiff's failure to comply with this rule has made it unfairly burdensome for them to determine what plaintiff disputes, what he admits and what evidence he relies upon in each instance. Defs.' Objs., filed June 30, 2008, at 2. Plaintiff did not reproduce defendants' itemized list of facts, but it appears that defendants did not strictly comply with each technical requirement of the rule either. The rule provides that:

> Each motion for summary judgment or summary adjudication shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate discretely each of the specific material facts relied upon in support of the motion and cite the particular portions of any pleading, affidavit, deposition, interrogatory answer or other document relied upon to establish that fact.

Local Rule 56-260(a). Here, defendants filed a single motion for summary judgment. But each defendant filed a Statement of Undisputed Facts, when the rule required a single such statement.[8] Furthermore, both defendants include several facts in almost every enumerated section instead of enumerating the facts "discretely."[9] The point is that regardless of whether the statement of facts is contained in the brief, or a separate document, the rule requires that each material factual assertion be annotated with a citation to whatever specific evidence supports the factual assertion. Likewise, whether this incarcerated pro se plaintiff repeats every fact in defendants' itemized list does not determine whether this motion should be granted. What assists the court is

---

[8] Parties filing separate motions may "jointly file a stipulation setting forth a statement of stipulated facts to which all interested parties agree." *See* Local Rule 56-260(c).

[9] According to Merriam Webster's Collegiate Dictionary, 332 (10th ed. 1997), "discrete" means "constituting a separate entity; individually distinct."

8

1   a meaningful discussion of the core material facts that will actually make a difference in the

2   outcome of this case with a focus on whether there is a genuine dispute over those facts. Ideally,

3   that discussion will contain citation to the evidence that supports each sides version of those

4   facts and apply the summary judgment standards in arguing whether any dispute is material, and

5   if so, whether it is genuine. On the other hand, lengthy itemized lists of disassociated facts

6   outside of that context, and quarrels over whether either side has reproduced the other's list, are

7   not particularly helpful.

8        Defendants also object that the court cannot rely on plaintiff's statements of fact or

9   opinion in the complaint. They contend that the complaint does not conform to the form of an

10  affidavit as required by the Federal Rules of Civil Procedure or the Local Rules of this court.

11  Defs.' Objs. at 2. Furthermore, they contend that insofar as plaintiff offers diagnoses or medical

12  opinions, he is not qualified to do so. *Id.* The court has examined the complaint and finds that

13  plaintiff does not offer diagnoses and opinions *per se*. Rather, he alleges factual grounds for

14  relief. If the defendants are referring to plaintiff's assertion that he had an infection of his

15  tracheotomy as evidenced by redness, swelling and soreness, the court does not consider this to

16  be an expert opinion. This is a recitation of symptoms he says he experienced and a reasonable

17  allegation of injury. Any lay person with an opening in their trachea might have familiarity with

18  such a condition. Furthermore, they are subject to proof and defendants may offer evidence

19  contesting all of plaintiff's allegations. Thus, defendants' objections are overruled.

20       Lastly, defendants object to the court relying on the allegations in plaintiff's complaint or

21  the attachments to it as evidence in support of plaintiff's case. Defendants assert that the

22  assertions are unsworn, lack foundation and contain hearsay. Defs.' Objs. at 2. They also assert

23  that the evidence does not conform to the required form of an affidavit because the statements

24  are unsworn, lack foundation, are not authenticated and contain hearsay. *Id*. at 3. For the

25  reasons explained, the objections are overruled.

26  ////

1    Although it appears to have become all the rage for litigants to object to every item of

2  evidence the opposing party submits on summary judgment practice, doing so simply does not

3  help the process.  Plaintiff's evidence and defendants' objections cannot be divorced from the

4  nature of this proceeding, i.e., summary judgment, in which defendants are the moving parties.

5  *See Burch v. Regents of the University of California*, 433 F.Supp.2d 1110, 1118-1124  (E. D.

6  Cal. 2006).  The portion of the rule governing such a motion supported by affidavits and records

7  provides that the affidavits "shall set forth such facts as would be admissible in evidence . . . ."

8  Fed. R. Civ. P. 56(e).  On summary judgment, the non-moving party's evidence need not be in a

9  form that is admissible at trial.  *See Burch*, 433 F.Supp.2d at 1119 (*citing Celotex Corp. v.*

10  *Catrett*, 477 U.S. 317, 324 (1986)).  Instead, a court is concerned with the admissibility of the

11  contents of the evidence.  *Id.*  Thus, on summary judgment, "objections to the *form* in which the

12  evidence is presented are particularly misguided where, as here, they target the non-moving

13  party's evidence."  *Burch*, 433 F.Supp.2d at 1119.  Accordingly, as long as a party submits

14  evidence which, regardless of its form, may be admissible at trial, it may be considered on

15  summary judgment.  *Id.* at 1120.

16    Defendants' object that plaintiff's evidence lacks a proper foundation or authentication.

17  In summary judgment practice, the party relying on affidavits and records must lay a proper

18  foundation.  *Beyne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).  The court

19  agrees that "whether the authentication requirement should be applied to bar evidence when its

20  authenticity is not actually disputed is, however, questionable."  *Burch*, 433 F.Supp.2d at 1120.

21  "[W]here the objecting party does not contest the authenticity of the evidence submitted, but

22  nevertheless makes an evidentiary objection based on purely procedural grounds," then the court

23  should consider the evidence.  *Id.*  In such a situation, it would appear equally probable that the

24  documents are what they purport to be as it is that they are not.  *See Id.*

25    Here, defendants do not actually contest the authenticity of the documents plaintiff has

26  submitted.  The objection is particularly ill-founded where, as here, all the documents plaintiff

1  submits would find their source in the prison system, either in plaintiff's files or in the prison

2  bureaucracy. Thus, if there were a valid basis for contesting their authenticity, defendants could

3  unearth and present it. But they have not. Therefore, all defendants' objections for lack of

4  proper foundation and lack of authentication are overruled.

5      Defendants also object on hearsay grounds. This objection is overruled for two reasons.

6  The first is the form of the objection and the second is the nature of the non-moving party's

7  burden on summary judgment. The objections are *pro forma* in that defendants object to entire

8  documents, not particular statements. An objection based on hearsay inherently is bound to the

9  context in which the allegedly objectionable evidence is offered. *See Burch*, 433 F.Supp.2d at

10  1122 ("even seemingly appropriate objections based on hearsay and failures to authenticate/lay a

11  foundation are difficult to address away from the dynamics of trial.") Insofar as a letter or record

12  may on its face constitute hearsay, the particular statements upon which plaintiff relies may very

13  well either be admissible nonetheless or may not be hearsay, depending on the purpose for which

14  plaintiff offers the statement. "The court is not inclined to comb through these documents,

15  identify potential hearsay, and determine if an exception applies - all without guidance from the

16  parties." *Id.* at 1124. Thus, to prevail on a hearsay objection, defendants must object to

17  particular statements and explain the objection. Defendants' failure to do so is sufficient basis

18  for overruling the objection.

19      With respect to the nature of this proceeding, "the court cannot ignore the fact that a non-

20  movant in a summary judgment setting is not attempting to prove its case, but instead seeks only

21  to demonstrate that a question of fact remains for trial." *Burch*, 433 F.Supp.2d at 1121. The

22  court thus "treat[s] the opposing party's papers more indulgently than the moving party's

23  papers." *Id.* (*citing, Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir. 1985)). While a court

24  need not ignore the evidentiary ramifications of a declaration based nearly entirely on hearsay,

25  *see Burch*, 433 F.Supp.2d at 1121 (noting that the Ninth Circuit does not uniformly apply the

26  principle of indulgence), it is worth pointing out that plaintiff proceeds without counsel.

11

1  Furthermore, he does not rely on evidence which on its face presents evidentiary obstacles which

2  would prove insurmountable at trial. *See Id.* at 1122 (noting that at trial, "when a party raises

3  valid evidentiary objections, the opposing party will have an opportunity to present the evidence

4  in an alternative and admissible form."). Insofar as there may be valid hearsay objections, they

5  are better left for trial, if there is to be one.

6       Accordingly, defendants' objections to the plaintiff's complaint, attachments and

7  evidence submitted in opposition to this motion are denied.

8  **IV.     Summary Judgment Standards**

9       Summary judgment is appropriate when it is demonstrated that there exists "no genuine

10  issue as to any material fact and that the moving party is entitled to a judgment as a matter of

11  law." Fed. R. Civ. P. 56(c).

12               Under summary judgment practice, the moving party
                always bears the initial responsibility of informing the district
13               court of the basis for its motion, and identifying those portions of
                "the pleadings, depositions, answers to interrogatories, and
14               admissions on file, together with the affidavits, if any," which it
                believes demonstrate the absence of a genuine issue of material
15               fact.

16       Summary judgment avoids unnecessary trials in cases with no genuinely disputed

17  material facts. *See Northwest Motorcycle Ass'n v. United States Dep't of Agric.*, 18 F.3d 1468,

18  1471 (9th Cir. 1994). At issue is "whether the evidence presents a sufficient disagreement to

19  require submission to a jury or whether it is so one-sided that one party must prevail as a matter

20  of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Thus, Rule 56 serves to

21  screen the latter cases from those which actually require resolution of genuine disputes over

22  material facts; e.g., issues that can only be determined through presentation of testimony at trial

23  such as the credibility of conflicting testimony over facts that make a difference in the outcome.

24  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

25       Focus on where the burden of proof lies as to the issue in question is crucial to summary

26  judgment procedures. "[W]here the nonmoving party will bear the burden of proof at trial on a

12

1  dispositive issue, a summary judgment motion may properly be made in reliance solely on the

2  'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed,

3  summary judgment should be entered, after adequate time for discovery and upon motion,

4  against a party who fails to make a showing sufficient to establish the existence of an element

5  essential to that party's case, and on which that party will bear the burden of proof at trial. *See*

6  *id.* at 322. In such a circumstance, summary judgment should be granted, "so long as whatever

7  is before the district court demonstrates that the standard for entry of summary judgment, as set

8  forth in Rule 56(c), is satisfied." *Id.* at 323.

9      If the moving party meets its initial responsibility, the opposing party must establish that

10  a genuine issue as to any material fact actually does exist. *See Matsushita Elec. Indus. Co. v.*

11  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To overcome summary judgment, the opposing

12  party must demonstrate a factual dispute that is both material, i.e. it affects the outcome of the

13  claim under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

14  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987), and

15  genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

16  party. *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987). In this

17  regard, "a complete failure of proof concerning an essential element of the nonmoving party's

18  case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. In attempting to

19  establish the existence of a factual dispute that is genuine, the opposing party may not rely upon

20  the allegations or denials of its pleadings but is required to tender evidence of specific facts in

21  the form of affidavits, and/or admissible discovery material, in support of its contention that the

22  dispute exists. *See* Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11. It is sufficient that

23  "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

24  versions of the truth at trial." *T.W. Elec. Serv.*, 809 F.2d at 631.

25      Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the

26  proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587

1 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).  However, the

2 opposing party must demonstrate with adequate evidence a genuine issue for trial.

3 *Valandingham v. Bojorquez*, 866 F.2d 1135, 1142 (9th Cir. 1989).  The opposing party must do

4 so with evidence upon which a fair-minded jury "could return a verdict for [him] on the evidence

5 presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 252.  If the evidence presented

6 could not support a judgment in the opposing party's favor, there is no genuine issue.  *Id.*;

7 *Celotex Corp. v. Catrett*, 477 U.S. at 323.

8       In resolving a summary judgment motion, the court examines the pleadings, depositions,

9 answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

10 Civ. P. 56(c).  The evidence of the opposing party is to be believed.  *See Anderson*, 477 U.S. at

11 255.  All reasonable inferences that may be drawn from the facts placed before the court must be

12 drawn in favor of the opposing party.  *See Matsushita*, 475 U.S. at 587.  Nevertheless, inferences

13 are not drawn out of the air, and it is the opposing party's obligation to produce a factual

14 predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 602 F.

15 Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

16 demonstrate a genuine issue, the opposing party "must do more than simply show that there is

17 some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could

18 not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

19 trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

20       On May 30, 2007, the court advised plaintiff of the requirements for opposing a motion

21 pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See Rand v. Rowland*, 154 F.3d

22 952, 957 (9th Cir. 1998) (en banc),  *cert. denied*, 527 U.S. 1035 (1999), and *Klingele v.*

23 *Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

24 **V.      Analysis**

25       Plaintiff claims that both defendants were deliberately indifferent to his serious medical

26 needs.  The defendants contend that there is no genuine issue about whether they were

14

deliberately indifferent.  Prison officials violate the Eighth Amendment when they are

deliberately indifferent to prisoner's serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 106

(1976).  A serious medical need is one that significantly affects an individual's daily activities, an

injury or condition a reasonable doctor or patient would find worthy of comment or treatment,

and chronic and substantial pain.  *See*, *e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir.

1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.2d 1133, 1136 (9th

Cir.1997) (*en banc*)   A prison official is deliberately indifferent when he knows of and

disregards a risk of injury or harm that "is not one that today's society chooses to tolerate.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference may be shown by the

denial, delay or intentional interference with medical treatment or by the way in which medical

care is provided.  *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988).  Prison

personnel risk Eighth Amendment liability if they knowingly prescribe specifically

contraindicated medications, fail to treat a known, serious medical condition or ignore a

physician's prescribed treatment.  *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989);

*Hunt v. Dental Dep't*, 865 F.2d 198, 201 (9th Cir. 1989);  *Wakefield v. Thompson*, 177 F.3d 1160

(9th Cir. 2003).  Negligence in diagnosing or treating a medical condition, does not violate a

prisoner's Eighth Amendment rights.  *Hutchinson*,  838 F.2d at 394.  Here, defendants do not

dispute that they knew of plaintiff's tracheotomy or that is a serious medical need.  Therefore,

the question is whether they denied, delayed or interfered with adequate medical care, or whether

they provided care in a way that exhibited deliberate indifference.

**A.  Dr. James**

Plaintiff's allegation as to Dr. James is that he was deliberately indifferent to plaintiff's

need for maintenance and care of his tracheotomy.  Plaintiff claims that on November 7, 2005,

Dr. James ignored his complaints when plaintiff complained of difficulty breathing, nose bleeds,

inadequate medical supplies, sanitary medical needs, sore throat, and requested that his

tracheotomy be changed.  He asserts that the altitude at High Desert State Prison ("HDSP"),

15

1  where he was housed at the time, contributed to his nosebleeds, sore throat and difficulty in

2  breathing. *Id.* at 5. Plaintiff alleges that Dr. James falsely noted in plaintiff's medical records

3  that plaintiff was doing well. *Id.*

4  It is undisputed that Dr. James is a primary care physician, and that as such, it is his

5  responsibility to refer patients to specialists for medical conditions beyond his expertise. He was

6  not qualified to provide any surgical procedures associated with plaintiff's tracheotomy. With

7  the exception of the December 5, 2005, examination in relation to plaintiff's grievance, Dr.

8  James denies any recollection of the particular dates he examined plaintiff. He does not deny

9  having seen plaintiff on November 7, 2005, but he does not directly address what transpired that

10  day.[10] He recalls examining plaintiff at least five times while plaintiff was at HDSP and asserts

11  that on each occasion he ensured that plaintiff was breathing properly and there were no signs of

12  infection around the tracheotomy. Dr. James' assertions are supported by Dr. Hudson's findings

13  that plaintiff had no sign of infection, and he could breathe and speak well while "corked."

14  Plaintiff has not submitted any evidence to contest these facts. Insofar as plaintiff believes that

15  Dr. James' notes about the November 7 visit were false, it is plaintiff's burden to prove this fact.

16  He has not submitted any evidence about his condition on that date. Thus, there is no genuine

17  dispute about whether Dr. James' November 7, 2005, examination and treatment of plaintiff fell

18  below the level required by the Eighth Amendment.

19  With respect to plaintiff's allegation that Dr. James refused to clean plaintiff's

20  tracheotomy, the outcome is the same. It is undisputed that it is standard practice for patients

21  who are able to clean their own tracheotomies. It also is undisputed that on October 25, 2005,

22  Dr. James prescribed supplies for plaintiff to care for his tracheotomy with provisions for

23  ongoing replacement of certain supplies as they were consumed. There is evidence that Dr. Cox

24  did the same on October 28, 2005. Plaintiff has not submitted any evidence that he did not

25

26  [10] No party has submitted records documenting the November 7 visit.

receive these supplies, and that if he did not, Dr. James prevented plaintiff from receiving them. When Dr. James prescribed more supplies in response to plaintiff's grievance, he ensured their distribution to plaintiff. Furthermore, plaintiff has lived with this condition since 1977, and must have cleaned it without the assistance of trained medical staff for years. He offers no evidence that he suffers any disability or medical condition that makes it impossible, or even difficult, to clean it himself now. Plaintiff offers the declaration of a fellow prisoner who states that he heard Dr. James refuse to clean plaintiff's tracheotomy. But Dr. James does not dispute that he refused to clean the tracheotomy. The fact that Dr. James and Dr. Cox issued him supplies to clean the tracheotomy himself is evidence that he was able to on his own. Furthermore, Dr. James instructed plaintiff about how to clean the tracheotomy as a result of plaintiff's December 5 appeal. Any serious difficulties plaintiff might have had in performing this task likely would have become apparent during this instruction. However, there is no evidence that plaintiff had difficulty with this lesson. The record is devoid of evidence that plaintiff could not do routine cleaning himself. Therefore, there is no genuine dispute about whether Dr. James was deliberately indifferent to plaintiff's serious medical needs by refusing to clean plaintiff's tracheotomy.

With respect to plaintiff's claim that he required frequent "medical cleaning," plaintiff again fails to satisfy his burden. It is not clear what "medical cleaning" is or whether Dr. James was qualified either to do it or make a decision about it. However, it is undisputed that Dr. James referred plaintiff to an ENT specialist, Dr. Hudson. Dr. Hudson described as "misguided" plaintiff's notion that "the trach should be changed twice a month because otherwise it becomes infected." Rather, the inner cannula needed to be changed, but she recommended changing the tracheotomy itself once or twice every five or six months. It is possible that prison conditions necessitate more frequent or meticulous cleaning and maintenance of the tracheotomy than is required outside of prison. But plaintiff does not submit any evidence that this is the case, or that Dr. James knew it when he made decisions about plaintiff's medical condition. Overall, the

17

1  evidence shows that Dr. James limited his examination of plaintiff and decisions about the

2  tracheotomy to that which he clearly was competent to perform, and referred matters outside his

3  expertise to a specialist. On this evidence, the court cannot find that there is a genuine dispute

4  about whether Dr. James provided constitutionally inadequate medical care on November 7,

5  2005.

6      The last question with respect to Dr. James is whether this matter should go to trial on the

7  issue of whether this defendant was deliberately indifferent to the effect the altitude had on

8  plaintiff. Dr. James asserts that he checked plaintiff's oxygen saturation on several occasions,

9  and that plaintiff's levels were normal. While plaintiff asserts that he told Dr. Hudson he was

10 having shortness of breath, Dr. Hudson noted that plaintiff made no such complaint.

11 Furthermore, she made no notation about nosebleeds or sore throats. Under the rule governing

12 summary judgment, plaintiff cannot rest on the mere allegations of his pleading in order to go to

13 trial on this issue.[11] *See* Fed. R. Civ. P. 56(e)(2). Plaintiff has not submitted any affidavits or

14 other evidence about the effect the altitude had on his health. Thus, there is no evidence that the

15 altitude had any effect on plaintiff's health, and there is no genuine dispute for trial.

16      For all the reasons stated, Dr. James' motion for summary judgment must be granted.

17 **B. Dr. Roche**

18      The outcome with respect to Dr. Roche is the same. Plaintiff claims that Dr. Roche was

19 deliberately indifferent to his serious medical needs by failing to enforce approval for plaintiff to

20 use a suction device as needed and by failing to ensure that plaintiff received a new tracheotomy

21 tube, neck collar, tracheotomy brush and inner cannula. It is undisputed that Dr. Roche was not

22 responsible for providing direct care to plaintiff. Instead, he reviewed plaintiff's grievance and

23

24      [11] To function as an affidavit on summary judgment, a verified complaint must be based
   on personal knowledge and set forth specific facts admissible in evidence. *Schroeder v.*
   *McDonald*, 55 F.3d 454, 460 (9th Cir. 1995). Plaintiff's complaint merely alleges that he
25 experienced shortness of breath and he told doctors about it. There is no detail, such as how
   often he suffered this symptom or the consequences of it, that would justify the court relying on
26 the complaint as an affidavit.

the disposition it, and plaintiff's medical records to ensure he received proper care.  Dr. Roche

was a supervisor in this case.  A person is subject to liability under 42 U.S.C. § 1983 if he

commits or directs an act or omission that violates a plaintiff's constitutional rights.  *Johnson v.*

*Duffy*, 588 F.2d 740, 743 (9th Cir. 1978); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

"There is no respondeat superior liability under section 1983." *Taylor*, 880 F.2d at 1045; *Ybarra*

*v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-81 (9th Cir.1984).  "Supervisory

liability exists even without overt personal participation in the offensive act if supervisory

officials implement a policy so deficient that the policy itself is a repudiation of constitutional

rights and is the moving force of the constitutional violation." *Hansen v.  Black*, 885 F.2d 642,

646 (9th Cir.1989) (quotation marks and citation omitted).  To hold a supervisor liable for the

unconstitutional acts of his subordinates, there must be a "causal connection between the

supervisor's wrongful conduct and the constitutional violation."  *Redman v. County of San*

*Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991)  (en banc).  This connection may be established by

showing the supervisor personally participated in or directed the violation, *Taylor v. List*, 880

F.2d 1040, 1045 (9th Cir. 1989), implemented a policy so deficient as to be the moving force of

the violation, *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989), or by omitting to perform an

act he was legally required to do, *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978), such as

failing to take adequate steps to address a violation of which he knew or should have known, *see*,

*Jones v. Williams*, 297 F.3d 930, 937 & fn. 4 (9th Cir. 2002).  Plaintiff does not submit copies of

any medical records.  The evidence before the court shows that Dr. Roche reviewed records

showing that plaintiff's breathing was normal, his oxygen saturation was normal, he had been

issued supplies to care for his tracheotomy and had been instructed how to clean it.  Plaintiff

does not submit any evidence that Dr. Hudson's recommendations were outside the range of care

required by the Eighth Amendment.  Dr. Roche therefore was justified in deferring to her

medical judgments.  On the record currently before the court, there is no genuine dispute about

whether Dr. Roche caused, participated in or ratified a violation of plaintiff's constitutional

1 rights.

2 **VI.    Conclusion**

3    For the reasons explained above, defendants' objections to plaintiff's evidence must be

4 overruled and their request that the court take judicial notice is denied.  Furthermore, the court

5 finds that there is no genuine dispute about whether either Dr. James or Dr. Roche was

6 deliberately indifferent to plaintiff's serious medical needs.  Therefore, their motion for summary

7 judgment must be granted.

8    Accordingly, it is ORDERED that defendants' objections to plaintiff's evidence are

9 OVERRULED.

10    Further, it is hereby RECOMMENDED that:

11    1.  Defendants' January 10, 2008, motion for summary judgment be granted;

12    2.  That judgment be entered in their favor; and,

13    3.  The Clerk be directed to close the case.

14    These findings and recommendations are submitted to the United States District Judge

15 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

16 after being served with these findings and recommendations, any party may file written

17 objections with the court and serve a copy on all parties.  Such a document should be captioned

18 "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

19 within the specified time may waive the right to appeal the District Court's order. *Turner v.*

20 *Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

21 Dated:  March 13, 2009.

22    _____

23    EDMUND F. BRENNAN
    UNITED STATES MAGISTRATE JUDGE

24

25

26